# UNITED STATES DISTRICT COURT
for the
Southern District of California



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Moto Cellular Telephone, Model XT1687, Type M266C,<br>SIM Drive Showing # 351856086710928 | ) ) ) ) ) ) Case No.  '19 MJ 2888 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached Affidavit of Special Agent Ventura Jimenez, Drug Enforcement Administration

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

S.A. Ventura Jimenez, Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/10/19

_____
*Judge's signature*

City and state: San Diego, CA    Hon. William V. Gallo, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952 and 960, Importation of Methamphetamine, is:

> Moto Cellular Telephone
> Cracked screen
> Model XT1687 and Type M266C with a SIM Drive showing number 351856086710928
> **(Target Device #2)**



The **Target Device #2** is currently in the possession of the Drug Enforcement Administration, 2255 Niels Bohr Ct, San Diego, California 92514.

## **ATTACHMENT B-2**

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 5, 2019 through June 5, 2019:

   a. tending to indicate efforts to import controlled substances from Mexico into the United States;

   b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

   d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the subject phone; or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.

## AFFIDAVIT IN SUPPORT OF WARRANT

I, Ventura Jiménez Jr., being duly sworn, hereby state as follows:

### INTRODUCTION

1. This affidavit supports an application for warrants to search the following electronic devices: one Huawei cellular telephone, black (front) and silver (back) in color, Model BND-L34 and Serial Number 4AV7N18B 16000460 ("**Target Device #1**") and a Moto cellular telephone with a cracked screen, black (front) and silver (back) in color, Model XT1687 and Type M266C with a SIM Drive showing number 351856086710928 ("**Target Device #2**") (collectively, "**Target Devices**") as described in Attachments A-1 and A-2 (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960.

2. The **Target Devices** were seized from Christopher Clayton RHODES incident to his arrest for violation of Title 21, United States Code, Sections 952 and 960, Importation of Methamphetamine, at the San Ysidro, California Port of Entry on June 5, 2019. The **Target Devices** are currently in the possession of the Drug Enforcement Administration, 2255 Niels Bohr Ct, San Diego, California 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B-1 and B-2 (incorporated herein by reference.)

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

//

## EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) of the United States Drug Enforcement Administration (DEA) and have been employed since June 2005. As such, I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

6. I am currently assigned to the DEA San Diego, California Field Division, San Ysidro Resident Office (DEA-San Ysidro). DEA-San Ysidro conducts drug investigations and specializes in the detection, penetration, and dismantlement of Mexican drug trafficking organizations, often coordinated with the Federal Bureau of Investigation (FBI), the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI), Immigration and Customs Enforcement (ICE), United States Border Patrol (USBP), United States Customs and Border Protection (CBP), and state/local law enforcement personnel designated as Task Force Officers (TFOs).

7. I have completed the DEA's Basic Agent Training. The curriculum for the nineteen (19)-week course included federal law relating to drug-related offenses and criminal investigations, drug identification, physical surveillance, undercover negotiations, and electronic surveillance, Federal criminal procedure, Federal Statutes, and DEA regulations. In the course of my employment, I have conducted investigations into illegal drug distribution conspiracies, participated in the arrest of individuals for drug-related offenses, and authored and executed search warrants for evidence of drug-related offenses.

8. Prior to joining DEA, I served as a commissioned officer in the United States Navy and Navy Reserve for approximately twenty (20) years. During that time, I participated in the tracking and interdiction of international maritime seizures involving significant quantities of controlled substances.

9. I have specialized training and experience in drug-smuggling and

2

distribution investigations, to include, but not limited to, drug-interdiction, drug-detection, money-laundering techniques, and the investigation of individuals involved in the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. I have participated in cases involving the seizure of distributable amounts of marijuana, cocaine, heroin, and methamphetamine. I have also seized or assisted in the seizure of drugs in subterranean tunnels, drug-related paraphernalia, drug ledgers, and other documents and records used to facilitate the activities of drug-trafficking organizations ("DTOs"). I have debriefed hundreds of defendants and witnesses who have had personal knowledge regarding DTOs. I have participated in many aspects of drug investigations, including physical and electronic surveillance and the service of search warrants. I have been an affiant for multiple prior search warrants.

10.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a.  Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b.  Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c.  Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d.  Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e.  Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

  f. Drug smugglers therefore generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.

11. Based on my training and experience, including consultations with other law enforcement personnel, I know that drug traffickers commonly use electronic devices such as cellular telephones to store names, telephone numbers, records, drug ledgers, and other information pertaining to drug trafficking activity. I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating drug conspiracies that searches of cellular/mobile telephones yields evidence:

  a. tending to indicate efforts to import controlled substances from Mexico into the United States;

  b. tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, phone numbers—that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

  d. tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the subject phone; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

12. Based upon my training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs and use cellular telephones, emails, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

13. I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

14. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of methamphetamine. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use cellular and

digital telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular and digital telephones.

15. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a drug smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

**FACTS SUPPORTING PROBABLE CAUSE**

16. On June 5, 2019, at approximately 11:40 a.m., Rhodes, a United States citizen, applied for permission to enter into the United States from Mexico through the San Ysidro, California Port of Entry. Rhodes was the driver and sole occupant of a 2005 Kia Sorrento bearing California license plate 5LJD414 (the "Vehicle").

17. A Customs and Border Protection Officer ("CBPO") conducted the primary inspection of Rhodes. Rhodes provided the CBPO with a United States Passport card with his name and photo for admission. The CBPO asked Rhodes where he was going and the Defendant stated he going to his mother's house in El Cajon, California. The CBPO asked Rhodes twice what he was bringing back from Mexico into the United States and the Defendant stated "nothing" both times. The CBPO queried Rhodes and a computer-generated alert on the Defendant appeared on the computer screen. The CBPO tapped the gas tank, and it tapped solid. The CBPO then requested for a Canine Enforcement Officer (CEO) over the radio, and the CEO's canine alerted to a trained odor and indicated to the gas tank of the Vehicle. The CBPO referred the vehicle for further inspection.

18. In secondary inspection, CBP removed 50 packages from the gas tank. The packages amounted to a total approximate weight of 24.34 kilograms (53.54 pounds) of methamphetamine. A CBPO field-tested the substance contained within one of the packages which tested positive for methamphetamine. Defendant was placed under arrest.

Later the same day, CBPOs moved the Vehicle to the storage lot and allowed a CEO and the CEO's canine for training purposes to sniff the Vehicle. The CEO's canine alerted to the trained odor and indicated to the back seat of the Vehicle. CBPOs searched the area and discovered an additional 20 packages from the back seat. The packages amounted to a total approximate weight of 9.68 kilograms (21.29 pounds) of methamphetamine. A CBPO field-tested the substance contained within one of the packages which tested positive for methamphetamine.

19. CBPOs seized the **Target Devices** incident to Rhodes' arrest, and Rhodes referred to the **Target Devices** as his own during his post-*Miranda* interview.[1] After being advised of and waiving his rights under *Miranda*, Rhodes stated a man he was dating from Mexico gave him the Vehicle in early April, although he later mentioned he received the Vehicle three weeks ago. Rhodes stated he did not know the man's name but that he had seen him the day before. Rhodes also claimed that he dropped the Vehicle off at a mechanic's shop in Tijuana the day prior to this arrest to fix the radiator and passenger window and to get new tires. Rhodes did not know who recommended the mechanic shop to him, but later stated that he did not need to pay for the mechanic because a friend of a friend said to take the Vehicle there.

20. Rhodes further indicated that the last time he drove through the Port of Entry, the canine alerted to the Vehicle. Rhodes also stated that about five days ago the Vehicle was scanned twice and the canine alerted to the gas tank.

21. On June 6, 2019, a complaint was filed charging Rhodes with Importation of Methamphetamine in violation of Title 21, United States Code, Sections 952 and 960. On July 3, 2019, Rhodes waived indictment and was charged in a one-count information with Importation of Methamphetamine in violation of 21 U.S.C §§ 952, 960 in the Southern District of California in case number 19-cr-02486-AJB.

22. As part of my investigation, I reviewed Rhodes' and the Vehicle's crossing

---

[1] On June 5, 2019, DEA agents did not manually review the contents of the Target Devices pursuant to border search authority and based on Rhodes not giving consent.

7

histories. I compared Rhodes' and the Vehicle's crossing histories and determined that Rhodes first crossed the Vehicle into the United States on or about April 30, 2019.

23. As part of my investigation, I reviewed the Vehicle's registration. The Vehicle was registered to Rhodes on May 9, 2019.

24. Based upon my experience and investigation in this case, I believe that Rhodes, as well as other persons, were involved in an ongoing conspiracy to import methamphetamine, or some other federally controlled substance into the United States. Based on my experience investigating drug smugglers, I also believe that Rhodes may have used the Target Devices to coordinate with co-conspirators regarding the importation of methamphetamine, or some other federally controlled substance into the United States.

25. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the drug trafficking activities of Rhodes, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos, and other digital information are stored in the memory of the Target Devices. Specifically, I believe that communications between Rhodes and the man who gave him the Vehicle and the individuals who coordinated his alleged work at the mechanic shop may be on the Target Devices.

26. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in transporting their valuable cargo to its destination within the United States. Given this, I request permission to search the Target Devices for items listed in Attachments B-1 and B-2 beginning on March 5, 2019, up to and including June 5, 2019. That date range is based on: (1) Rhodes's alleged California Vehicle registration, states it was issued on May 9, 2019; (2) Rhodes first crossed the vehicle on April 30, 2019; and (3) Rhodes stated a friend from Mexico gave him the vehicle in early April. Based upon my

8

training and experience, Rhodes would have been in communication with co-conspirators to plan his smuggling attempt in the months leading up to acquiring and beginning to cross the Vehicle.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

9

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

30. Based on all of the facts and circumstances described above, there is probable cause to conclude that Rhodes used the **Target Devices** to facilitate violations of Title 21, United States Code, Sections 952 and 960.

31. Because the **Target Devices** were promptly seized during the investigation of Rhodes trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by Rhodes continues to exist on the **Target Devices**.

32. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the item described in Attachments A-1 and A-2 and the seizure of items listed in Attachment B-1 and B-2, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Ventura Jiménez Jr.
DEA Special Agent

Subscribed and sworn to before me this 10 day of July, 2019.

_____
Hon. William V. Gallo
United States Magistrate Judge

10